# Exhibit J

**IN THE CIRCUIT COURT OF FAIRFAX COUNTY, VIRGINIA**
**19th JUDICIAL CIRCUIT**

CATHERINE A. BLOCH,
And SCOTT J. BLOCH,
8408 Stockdale Drive
Alexandria, VA 22308,

Plaintiffs,

v.

EXECUTIVE OFFICE OF THE PRESIDENT
of the United States,
The White House
1600 Pennsylvania Ave, N.W.
Washington, D.C. 20500,
CLAY JOHNSON, PATRICIA MARSHALL, DEBORAH KATZ, KATZ, MARSHALL & BANKS, LLP, JAMES BYRNE, C/o LOCKHEED MARTIN, JAMES MITCHELL THOMAS DAVIS, JR, KARL ROVE, LURITA DOAN, FRED F. FIELDING, PATRICK McFARLAND, JILL MARONEY, DAVID COPE, MARK ROBBINS, ELAINE KAPLAN, LINDA SPRINGER, HUMAN RIGHTS CAMPAIGN, NATIONAL TREASURY EMPLOYEES UNION, JEFF RUCH, POGO, GAP, PEER, TOM DIVINE, JOHN BERRY AS DIRECTOR OF U.S. OFFICE OF PERSONNELL MANAGEMENT, UNITED STATES OFFICE OF SPECIAL COUNSEL, AND OTHER UNKNOWN PERSONS, AND AGENTS OF OPM AND OSC,

2011-06099

Civil Action No.:

**JURY TRIAL DEMANDED**

**COMPLAINT FOR DAMAGES, CIVIL CONSPIRACY, DEFAMATION, DECLARATORY AND INJUNCTIVE RELIEF, CIVIL RICO BASE ON OBSTRUCTION OF JUSTICE AND INVESTGATIONS, CONSPIRACY TO VIOLATE OFFICER'S EXECUTION OF DUTIES OF OFFICE, FRAUD, INTERFERENCE WITH CONTRACT, NEGLIGENCE, PROFESSIONAL MALPRACTICE, CONSPIRACY TO VIOLATE CIVIL AN CONSTITUTIONAL RIGHTS UNDER COLOR OF LAW, RICO FIFTH AMENDMENT DUE PROCESS VIOLATIONS FOR SELECTIVE AND VINDICTIVE INVESTIGATION AND THREATENED PROSECUTION AND WILFULL SUBORNATION OF PERJURY AND TAMPERING GRAND JURY PROCEEDINGS, MISUSE OF CONFIDENTIAL GRAND JURY MATERIALS, PUBLICATION OF CONFIDENTIAL AND PRIVILEGED INFORMATION, CONVERSION OF**

| | | |
|---|---|---|
| | ) | **PROPERTY, INVASION OF PRIVACY,** |
| | ) | **BREACH OF DUTIES OF LOYALTY** |
| | ) | **AND FIDUCIARY DUTY,** |
| | ) | **INTENTIONAL AND NEGLIGENT** |
| | ) | **INFLICTION OF MENTAL AND** |
| Defendants. | ) | **EMOTIONAL DISTRESS, AND** |
| | ) | **PRIMA FACIE TORT** |

***NO SERVICE NEEDED AT THIS TIME***

## COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF AND REFERRAL FOR CRIMINAL INVESTIGATION OF THE DEFENDANTS

### INTRODUCTION - COMMON SCHEME OF WRONGDOING

Plaintiff Scott J. Bloch brings this action for declaratory and injunctive relief against Defendants for violating Plaintiff's constitutional and statutory rights to fulfill the duties and responsibilities of his office as Special Counsel at the U.S. Office of Special Counsel, for impeding, blocking, obstructing and intimidating Plaintiff and his office in the execution of its statutorily-authorized law-enforcement duties for the United States, for intimidation and other acts designed to drive him from office (when impeding and obstructing his investigations did not work), including making a false and fraudulent referral for criminal prosecution arising from administrative disagreements about the scope and power to investigate. Defendants' wrongdoing included a scheme by a United States Congressman and his staff to misue their power to protect a valued contributor and further the aims of the Republican National Committee, the West Wing of the White House, the Office of Political Affairs, the Office of Inspector General and Office of Personnel Management and its Inspector General, and Defendant Karl Rove and President

George W. Bush, and to ultimately threaten, impede and destroy Plaintiff's powers as Special Counsel, and then to threaten and persuade the U.S. Department of Justice to implement a Grand Jury investigation based on a false and knowingly improper basis, to raid Plaintiff's home and office and to prosecute Plaintiff on false evidence due to pressure from officials in Congress and the White House who had an obligation to wall themselves off from decisions about whether to approve a grand jury or subpoenas and raids of Plaintiff's offices and residence in full view of the public cameras and press that were purposely brought to bring disrepute on Plaintiff and the investigation the Office of Special Counsel were executing on The White House, the President of the United States, Karl Rove, the United States Department of Justice, the Attorney General's office, the United States Attorneys Office for the District of Columbia as well as many other United States' Attorneys' offices, the Executive Office of the United States Attorneys (EOUSA) as well as twenty-six agencies of government, Lurita Doan, the Secretary of the General Services Administration and a tie-in of corrutption with The RNC, the National Republican Congressional Committee (NRCC) and the United States Congressman Tom Davis (R-VA) and his staff and the committee staff of the Minority for the Oversight and Government Reform Committee, and the Federal Aviation Administration and the Aviation industry due to lax oversight of airworthiness directive compliance to assure passenger safety. Such investigations were pending, very public, and the subject of great press and media in the months preceding the raids by Defendants and their conspirators. Such raid on May 6, 2008, and ensuing Grand Jury Investigation by members of OPM and its inspector general office derived from a tainted, conflicted, and corrupt investigation launched by defendants previously, and continued with the Grand Jury

Investigation as set forth herein headed by and overseen by the defendants Office of Personnel Management, Inspector General Patrick McFarland, Clay Johnson, Linda Springer, in conjunction and working with Karl Rove, the FAA, and Plaintiffs are informed and believes and thereon allege that lobbyists of aviation industry and the Republican National Committee (RNC), to disrupt investigations into the potentially corrupt actions of Lurita Doan, Tom Davis, and others, to illegally divert campaign and contracting funds to Republican candidates for Congress and Governorships, and to shore up various interest groups of the RNC and National Republican Congressional Committee (NRCC), to expand its base, and to prevent and hinder Plaintiff Scott Bloch's further investigations pending against Doan and Davis in conspiracy with each other and others, and to further private interests, lobbyists and special interest groups, inside the White House and outside the White House, and to satisfy the vendetta of current officials at the United States Office of Personnel Management, political appointees and career officials.

Defendants invaded the privacy of Plaintiff and his family, retaliated against Scott Bloch's exercise of his Constitutional Rights including Freedom of Religion and Speech in the First Amendment to the United States Constitution and the freedoms in the Virginia Constitution, and violated Virginia and federal statutes protecting federal officers who execute laws to protect the civil rights of others. Defendants engaged in intentional interference with property rights and contractual rights, attempted to defame and harm the business and lawyer reputation of Scott J. Bloch and Catherine Bloch as employable persons, conspired to violate the laws including laws against Obstruction of Justice, Wire Fraud, and Mail Fraud, defamed Scott Bloch, intentionally inflicted mental and emotional distress on Plaintiff, perpetrated negligent and intentional

misrepresentations to officers of the U.S. government using illegal means in order to obtain illegal ends.

Defendants' actions include an attempt to force Bloch's resignation from office, and to hijack a criminal investigation, to infect an entire Grand Jury Process, to align the Justice Department with the Office of Personnel Management, in an illegal investigation, which was done to assist White House, Congressmen and staff and to protect an important Republican Party contributor, to have Plaintiff investigated for news articles it or its agents disclosed unlawfully or leaked or third-party conspirators leaked or disclosed unlawfully, and under that ruse determined ahead of time to have the matter referred to the US Attorney's Office for Grand Jury investigation and Prosecution. Said defendants intimidated career U.S. government officials into doing their bidding to criminalize Plaintiffs in their exercise of protected rights and statutory duties, and to destroy peace, harmony and employment of Plainitffs in their home and business. Said defendants used their positions of authority and their personal knowledge to divert confidential and legally protected information to members of the press to harass Plaintiffs in their home and with their friends, peers and neighbors in their physical property, their reputations, and to publicize infamously the improper, corrupt and illegal probe and raid of their agents, and to disrupt their practice of religion, speech and to conduct of their family life in peace and harmony.

This suit is brought for violations of the Virginia torts of Business Conspiracy, Prima Facie Tort, and other invasions of Privacy and other causes of action as set forth herein. In no fashion is this suit brought to challenge or call into question the official actions of members of Congress or Rep. Henry Waxman as Chair of Oversight and Government Reform Committee in

issuing requests to interview Plaintiff Scott Bloch, or to challenge actions of Rep. Tom Davis, Jr. in actions in connection with his duties as Congressman, or under the Speech and Debate Clause, but rather acts outside of that role in conspiracy with others or in furtherance of acts outside the scope of said duties and in direct violation of laws prescribed by the United States Congress with regard to its members' fund raising, diverting or influencing contracting money in exchange for favors, or otherwise interfering with the duties of federal officers outside of Congress in his private capacity and using his staff for same with reference to campaigning activities in his district or actions to retaliate against those perceived to interfere with his candidacy for Congress or Senate.

The bias and interest of investigators and officials involved so pervaded and corrupted the process as to destroy Plaintiff's rights as a public official and his rights as a citizen of the United States. It so corrupted the investigatory process and grand jury process as to deprive Plaintiff wholly of his substantial due process rights. Witnesses were intimidated, the grand jury process was corrupted and used to force witnesses into secret interrogations, it was used to deprive Plaintiff and his agency of its ability to complete its pending high-profile investigations of wrongdoing at the Justice Department.

As grounds therefor, Plaintiff alleges as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action because the acts complained of herein were done in Virginia at the home of Plaintiffs in Alexandria, Fairfax County, Virginia, or were done with knowledge of their harmful effects in Alexandria, Virginia, through publication in

press, television, radio, internet, and other ways that were foreseeable and expected and intended to harm plaintiffs in Virginia in a way that all defendants purposefully available themselves of the courts of the state of Virginia. Some of the Defendants are residents of the State of Virigina and on information and belief, planned, executed, or carried out illegal actions in Virginia.

2. Venue is proper in this district because the acts complained of occurred in part in Alexandria, Fairfax County, Virginia.

**PARTIES**

3. Plaintiffs are individuals and residents of the Commonwealth of Virginia. Since 2005 and until 2008, Plaintiff served as the Special Counsel at the U.S. Office of Special Counsel, an independent agency of the U.S. Government. Plaintiffs resided at the address listed above and still own said residence, during the periods of 2003-2009, and plan to return to said residence. Currently they live at another location but list this as their address to avoid harassment by Defendants.

4. Defendant Fred F. Fielding was at all times during the facts in this Complaint the Counsel to the President and is being sued in his official capacity. Defendant Clay Johnson worked in the Executive Office of the President and conducted illegal and improper activities in his personal capacity for personal gain or the gain of his President, George W. Bush, or the RNC, in furtherance of Karl Rove's actions after he left the West Wing of the White House. The actions of Karl Rove independently and in conspiracy with others, to harm Plaintiffs, occurred outside of his employment and at times after he left White House, from 2008 until the present. Defendant Elaine Kaplan was the former Special Counsel and from 2005 to the present, both as

counsel for National Employees Treasury Union, and Plaintiffs are informed and believes and thereon allege that in her current role as General Counsel of OPM, is conspiring with or has conspired with third parties to damage Plaintiffs as hereinafter alleged, improperly, illegally, and against the Ethics in Government Act, both as to her involvement in previous issues as Special Counsel of the OSC, and as General Counsel of OPM with conflicts of interest, personal and official, and to conspire to harm Plaintiffs with Deborah Katz and Katz Marshall & Banks LLP and other third parties, including to disrupt official investigations, undermine official functions in the Office of Special Counsel, divert loyalty of employees away from Scott Bloch, and otherwise seek to undermine and harm Plaintiffs in their reputation and family life. Defendant Patrick McFarland is Inspector General and also a member of the Integrity Committee of the President's Council on Integrity and Efficiency and served on that with Special Counsel Scott Bloch, and during that time, misused his position on the Integrity Committee and as Inspector General to disrupt Plaintiff Scott Bloch, interfere with his role on the Integrity Committee, seek to thwart the will of the Integrity Committee by leaking information outside the committee to staff members of Congress, third parties, officials of other agencies, to harm other Inspectors' General, and to use his position to disrupt Plaintiff as Special Counsel in his investigations and to further the efforts of Clay Johnson and others at the Office of the President to thwart Bloch and get him out of office. He also conspired with the other defendants to conduct his improper activities, improper and illegal assumption of powers, and other improper activity hereinafter described, including working with Deborah Katz, of Katz Marshall & Banks and Linda Springer to directly and indirectly harm Plaintiffs. Deborah Katz has falsified law, improperly interfered



[redacted]

with the Office of Special Counsel, and engaged in a long-standing campaign against Plainitffs to harm them in their business, professional and personal lives, in violation of ethics and law and using improper and fraudulent means including defamation, intimidation, false rumors, internet, and other devices and artifices.

## STATEMENT OF FACTS

5. The U.S. Office of Special Counsel ("OSC") is an independent federal agency charged with investigating and prosecuting Executive Branch misconduct. In order to insure its independence from political pressures, OSC has independent hiring, investigative, and prosecutorial authority.

7. OSC's primary mission is to safeguard the merit system by protecting federal employees and applicants from prohibited personnel practices, especially reprisals for whistleblowing, committed by Executive Branch officials. OSC's basic authorities come from four federal statutes: the Civil Service Reform Act, the Whistleblower Protection Act, the Hatch Act, and the Uniformed Services Employment and Re-employment Rights Act ("USERRA").

8. If OSC concludes that an Executive Branch official has committed a prohibited personnel practice against a federal employee, former federal employee, or applicant for federal employment, OSC may seek remedies for injuries suffered by the employee, former employee, or applicant, including an award of back pay or reinstatement, by negotiating with the responsible official's agency or by initiating litigation at the Merit Systems Protection Board ("MSPB"). OSC also may file complaints at the MSPB seeking disciplinary action against

Executive Branch officials who commit prohibited personnel practices. Under USERRA, OSC has additional independent litigation authority before federal courts.

9. OSC also is charged with receiving and reviewing complaints against Executive Branch officials accused of violating a law, rule or regulation, gross mismanagement, gross waste of funds, abuse of authority, or causing a substantial and specific danger to public health or safety.

10. As established by statute, OSC is headed by the Special Counsel, an individual appointed by the President, by and with the advice and consent of Senate, for a term of five years. Also by statute, the Special Counsel shall be an attorney who, by demonstrated ability, background, training, or experience, is especially qualified to carry out the duties and responsibilities of the office.

11. In order to maintain the independence of the office and to protect it from political and other pressures, the Special Counsel may be removed by the President **only** for inefficiency in office, neglect of duty, or malfeasance in office. 5 U.S.C. § 1211(b).

12. On June 26, 2003, President George W. Bush nominated Plaintiff to serve as Special Counsel in the U.S. Office of Special Counsel. The U.S. Senate unanimously confirmed Plaintiff on December 9, 2003. On January 5, 2004, Plaintiff was sworn in to serve a five-year term.

13. Plaintiff is an attorney and brought over 17 years of experience to OSC, including

experience litigating employment disputes, enforcing attorney ethics matters in referrals from a disciplinary agency, and various other complex cases before state and federal courts and administrative tribunals. He has briefed and argued cases before state and federal appellate courts and is admitted to practice before the United States Supreme Court.

14. From 2001-2003, Plaintiff served initially as Associate Director and then as Deputy Director and Counsel to the Task Force for Faith-based and Community Initiatives at the U.S. Department of Justice ("Justice Department"), where he worked on First Amendment cases, regulations, intergovernmental outreach, and programmatic initiatives. Before serving in the Justice Department, Plaintiff was a partner at the law firm of Stevens & Brand, LLP in Lawrence, Kansas, where he practiced in complex litigation, civil rights, employment law, and legal ethics.

**Plaintiff's Discretionary Decisions, Whistleblowing, and Retaliation For Them**

15. Upon taking office, Plaintiff initiated a comprehensive review of OSC operations, including OSC's legal and policy interpretations, organizational structure, staffing, and caseload. As a result of this review, and in consultation with his staff, Plaintiff concluded that his predecessor had erroneously determined that one of the key statutory provisions enforced by OSC, 5 U.S.C. § 2302, provided broad protection against discrimination on the basis of sexual orientation. In early 2004, Plaintiff thus directed that OSC's website, educational, and press materials no longer assert that sexual orientation was a special class protected by the statute while the agency studied the issue. Importantly, Plaintiff did not determine that persons seeking to remedy discrimination on the basis of sexual orientation had no legal remedy at OSC. Indeed,

Plaintiff concluded at the end of the legal review that such discrimination claims could be processed by OSC to the extent they alleged discrimination based on conduct not adversely affecting job performance. Plaintiff's determination in no way affected other types of remedies for discrimination based on sexual orientation, such as remedies afforded by the U.S. Equal Employment Opportunity Commission.

16. In March of 2004, the Deputy White House Counsel ("DWHC") met with Plaintiff, and also had made several phone calls personally or at his direction with Bloch's subordinates, and threatened Plaintiff with termination if he did not reverse his decision (described in the preceding paragraph) and place the materials on sexual orientation back on the OSC website and in promotional materials of OSC. When Plaintiff resisted taking orders from the DWHC and informed the counsel's office that he was the head of an independent agency that had prosecutorial discretion and the right to make determinations about the law independent of White House control or threats, the DWHC scoffed and asked, "What does independent mean in the executive branch?" Plaintiff was told he would become another victim of ouster like others who were not Presidentially Appointed, Senate Confirmed persons who could not be terminated under their statutes but for malfeasance, as was true of Plaintiff as Special Counsel of the United States.

17. Also as a result of Plaintiff's comprehensive review of OSC's operations, Plaintiff commenced a reorganization of OSC, which included the creation of a new field office in Detroit, new divisions, and directed the reassignment of twelve employees to different field

offices. Under Plaintiff's leadership, OSC resolved outstanding backlogs in all divisions and doubled enforcement levels in various divisions.

18. The reorganization within OSC generated substantial media interest, several congressional inquiries and GAO engagements, and complaints from disgruntled employees, government watch-dog organizationoig's, and gay-rights advocacy groups. Based upon malicious and wrongful motives, as alleged in greater detail below, Office of Personnel Management, Office of Inspector General ("OPM-OIG") initiated a wrongful and malicious investigation of Plaintiff.

19. Plaintiff appeared and testified at a hearing of the Senate Committee on Homeland Security and Governmental Affairs, Subcommittee on Oversight of Government Management, the Federal Workforce and the District of Columbia ("Senate Committee") regarding the subject matter of the complaint under investigation by OPM-OIG. Plaintiff also provided relevant documents to the Senate Committee and submitted written answers to post-hearing questions from several senators. The complaint also was the subject of an investigation by the House Committee on Oversight and Government Reform and at least two investigations by the Government Accountability Office ("GAO"). The conclusion of these Congressional and Executive branch investigations was that Plaintiff had fulfilled his responsibilities efficiently and within the boundaries of the law.

20. One Congressional panel concluded that one of the major allegations of the complaint, that Plaintiff had ordered the dismissal of whistleblower claims and other claims

without review, was false. This conclusion was based on a bipartisan investigation by over a dozen Senate and House staff investigators, viewing OSC files and speaking with OSC career employees, and concluding Plaintiff and OSC were doing a "great job for whistleblowers." See May 17, 2005 letter to Plaintiff from oversight Committee, Congressmen Tom Davis, Jr. and John Porter.

**The Complaint and Unlawful Investigation by Another Agency and its Inspector General**

21. On or about March 3, 2005, an alleged group of "anonymous OSC employees" and an alliance of advocacy groups filed a complaint against Plaintiff at the OSC accusing Plaintiff of committing prohibited personnel practices and other wrongs in connection with the policy review and reorganization Plaintiff had initiated upon entering office. Plaintiff Scott5 Bloch recused himself from investigating the matter under threat of firing by President Bush's longtime friend and confidante, Clay Johnson, by letter dated February __, 2006, and OSC subsequently entered into an agreement with the Office of Personnel Management, Office of the Inspector General ("OPM-OIG") by which OPM-OIG would investigate the allegations of the complaint pursuant to the Economy Act, 31 U.S.C. § 1535. OPM-OIG commenced its investigation on or about March 8, 2006. The investigation of this complaint remains pending before OPM-OIG. In perversion of law and in violation of the agreement allowing OPM-OIG to investigate this claim against OSC, OPM and OPM-OIG morphed its investigation of civil claims for prohibited personnel practices into a criminal matter with FBI--all in excess of its lawful jurisdiction if it ever had any, and was done in an effort to cover up its own wrongdoing, illegality, mishandling of the investigation, unauthorized assumption of powers, and on orders

from Davis, Doan, Fielding, Johnson, and unknown other intermediaries, staffers or members of Congress, placing pressure on individuals in the U.S. Department of Justice, the U.S. Attorneys Office of the District of Columbia, the FBI, and the OPM-IG and Executive Office of the President (EOP).

22. Plaintiff had only recused himself from an investigation he was authorizing the Integrity Committee of the President's Council on Integrity and Efficiency to conduct, even though it was clear that the executive orders authorizing those committees did not have power over OSC or Plaintiff to investigate him for official actions in discharge of his duties at OSC. Plaintiff was the Special Counsel over an independent administrative investigative, quasi-legislative, and prosecutorial agency. The authorizing statute, 5 U.S.C. § 1211 limited the President's power to remove Plaintiff during his five year term, and one-year holdover term if no person was confirmed to the position for that year (effectively a six-year term), except for "malfeasance, neglect of duty, or inefficiency in office."

23. This purported investigation was the result of White House Counsel Harriet Miers ordering Clay Johnson to have Plaintiff investigated by an Inspector General. Clay Johnson responded by asking the Deputy Special Counsel, James Renne what he thought about the complaint made against Plaintiff, and whether to appoint an Inspector General outside OSC. James Renne was no longer Deputy Special Counsel, was leaving the agency, and was on a military leave pending his last official days at OSC. The Acting Deputy Special Counsel was then James McVay. Apparently, Clay Johnson decided on his own to appoint OPM-O IG and ordered the Director of OPM to conduct an investigation of Plaintiff using the Economy Act,

which requires the head of an agency to make a finding "that it is in the best interests of the United States" to enter into an agreement with another agency to hire out on contract employees of that agency. The Economy Act does not authorize an agency to hire out the authority of another agency to suddenly have authority over a sister agency. It does not authorize another agency to attempt to usurp the powers of that sister agency or agency head, and even if an agreement attempted to be signed under the Economy Act it would be void as an attempt to usurp Congress' role in the creation of subordinate offices within the Executive Branch, and would be a violation of the United States' Constitution, Article II and Article I, and would violate the Separation of Powers.

24. There is no authority for the orders issued (as described in the preceding paragraph). OSC is independent of OPM. Each Inspector General answers to the agency head and is only authorized to conduct investigations of matters and persons within their own agency's authority. See --- U.S.C. ___ section1. Case law makes it clear that Inspectors General answer to their agency head. They can be removed by the President for any reason (when they are presidentially appointed), but that reason must be articulated to the Senate.

The letter authorizing the investigation by Johnson to OPM was also directed to Linda Springer, Director of OPM, and former confidante and employee of Clay Johnson, directing her to oversee the investigation, receive the findings of the OPM-IG and then make recommendations to Clay Johnson on any corrective action for employees and any disciplinary action for Plaintiff. Clay Johnson also directed that OPM-IG provide the Deputy Special Counsel with a copy of any findings that it was providing to Linda Springer.

25. Nevertheless, Clay Johnson ordered it, and Plaintiff objected because of the conflicts of interest in having OPM, its director, and the OPM-IG over OSC in an investigation of its head, and that head's exercise of discretion. The gravamen of the complaint filed by outside interest groups and anonymous employees of OSC was that Plaintiff had unlawfully removed references to "sexual orientation" discrimination from OSC's website and promotional materials, and had unlawfully found that OSC's laws do not permit Plaintiff or OSC to bring corrective action or disciplinary action investigations or complaints based on the term "sexual orientation" discrimination. This was an interpretation that for the first time was applied to OSC's enforcement statutes under the CSRA, in 1999 by Defendant Elaine Kaplan. She concluded that due to an Executive Order by President Clinton, and the OSC's statutory power to enforce discrimination on the basis of "conduct that does not adversely affect" the job of a federal executive branch employee, that Kaplan had the power to enforce "sexual orientation" discrimination as a status protection, not based on conduct as required by OSC's statutes. OPM worked closely with Kaplan to fashion a new statement about "sexual orientation" discrimination and placed it on OPM's website as "Guidance on Sexual Orienation Discrimination" and purported to refer any complainants over to OSC for prosecution under 5 U.S.C. 2303(b)(10), thus implying that this statute was the legal authority for OPM and OSC to enforce sexual orientation discrimination complaints and bring them before the court, MSPB, and after appeal, to the Federal Circuit Court and the United States Supreme Court. Yet, Congress had twice rejected coverage for Sexual Orientation discrimination under ENDA by vote of the Senate. The MSPB had ruled in a case in which a federal employee complained of

"sexual orientation" discrimination, that it was not covered under Title VII and OSC's categories for special protections for status, not conduct, 5 U.S.C. 2302(b)(1). See *Morales v. Dept. of Justice,* (1998). Plaintiff's reading of the statute and case law was was affirmed in *Mahaffey v. Dept. of Agriculture.* There is no countervailing authority binding OSC that has ever ruled differently, that does not require some evidence of conduct in a claim involving a federal employee's sexual conduct or statement of sexual identity or preferences. There is nothing in the statute or its history that mentions sexual orientation or sexual preference.

Thus, both due to its transactional conflict of interest, and because it had the power to deny Plaintiff an appeal after its investigation and any action before the court, OPM and its IG had fatal conflicts of interest, even assuming the White House had the power to simply tell an Inspector General with authority only in his own agency, to investigate the head of another agency.

26. At all times, the investigation sanctioned by Harriet Miers, and then Clay Johnson, was illegal, without authority, biased, ultra vires, and done with the intent to drive Plaintiff from office and impede, impair, interfere with, and prevent his execution of duties of office. Plaintiff objected publicly, to Congress, to OPM and its IG, and received a letter from the General Counsel of OPM, Mark Robbins, stating in February 2006 that OPM had no conflicts of interest but did not address the issues raised by Plaintiff's letter and legal memorandum of conflict, which was also copied to Clay Johnson.

27. Plaintiff wrote Clay Johnson a lengthy letter on January ___ 2006, stating the

conflicts and outlining the reasons why OPM could not be involved, and its IG could not be involved in investigating the complaint against Plaintiff. Plaintiff insisted he would gladly arrange to have an unbiased inspector general investigate the complaint, so long as the inspector general of another agency had no conflicts of interest and would agree not to violate the laws of OSC and other laws, as OPM-IG stated they were going to do.

28. Clay Johnson wrote Plaintiff on February, 2006, and threatened to have him fired By the President if he did not do what Johnson said – delegate his authority to investigate the complaint against the Special Counsel to Deputy Special Counsel McVay and have McVay sign an Economy Act Agreement with OPM-IG. Plaintiff was informed in the letter from Johnson threatening firing if he did not comply that he could of course object to anything Bloch felt he needed to object to concerning the investigation.

29. OPM-IG communicated in writing and verbally to James McVay, Deputy Special Counsel, their intention to violate OSC's laws in conducting the investigation, assume powers OSC did not have, and violate those powers OSC did. They had agreed in writing to conduct the investigation pursuant to OSC's laws, regulations, poclieis and procedures, but then recanted after signing the Economy Act Agreement.

30. From the outset until this day, OPM-IG and OPM has acted lawlessly, has attempted to destroy Plaintiff's ability to do his job, interfered with his duties, attempted to sway his employees against him, attempted to stray from the complaint it was attempting to investigate, violated OSC's laws, required employees to violate OSC's laws, and worked consistently with outside interest groups, complainants, and Congress to illegally publish and

willfully violate Plaintiff's privacy rights in leaking materials from the investigation, to imply that objections to the investigation lodged by Deputy Special Counsel were actually manifest evidence of Plaintiff obstructing the investigation.

31. OPM and OPM-IG determined that the substance of the complaint was just a foothold for constructing a base from which to assert criminal jurisdiction, and from there to find obstruction of justice by Plaintiff early on, and OPM-IG repeatedly exceeded their jurisdiction and met objections from the Deputy Special Counsel with threats, and they attempted to find a way to argue Plaintiff had obstructed their investigation. This included stating so to Deputy Special Counsel James Byrne and then causing that information to leak to the Washington Post and third party interest groups in February of 2007 just days after Deputy Special Counsel Byrne told Plaintiff he wanted to fire OPM-IG from the investigation and declare it over, due to OPM not properly doing any investigation, conducting an illegal investigation, and trying to harm Plaintiff. Following that meeting where OPM -IG in front of Clay Johnson stated that they were being obstructed in their investigation, a Washington Post article appeared stating that Special Counsel Bloch was obstructing the investigation. See *Washington Post* ____ Feb. 2007.

**The Rove Hatch Act Complaints and Another White House Attempt to Oust Plaintiff**

32. In the Fall of 2005, Plaintiff's office received two complaints under OSC's jurisdiction over Hatch Act violations. These were against Karl Rove, the White House, and the Office of Political Affairs, and came from an individual who is associated with the Green Party. These allegations were related to two different claims: (1) allegations of Karl Rove's misuse of funds in overseeing the reelection of President Bush and governors and Congressmen and



[redacted]

Senators during 2004 while he was being paid by the U.S. Treasury as Deputy Chief of Staff of the President and head of the Office of Political Affairs and the Office of Strategic Initiatives in the White House's West Wing; and (2) the misuse of Air Force One as well as other travel abuses during the Presidential election campaign of 2004.

33. Plaintiff authorized an investigation into these complaints ("Rove Complaints"), and in late 2005, the White House identified a violation of the Hatch Act in Rove's use of Air Force One for a purely political speech, and presented the records of that to OSC and Plaintiff as well as proof that as of that date, December 2005, or January 2006, they had reimbursed the Treasury as required by the Hatch Act regulations. OSC has exclusive jurisdiction to investigate and prosecute such violations of the Hatch Act.

34. After that, Plaintiff instructed his Hatch Act unit to investigate the Rove Complaints further and look at all travel records for Air Force One for the Presidential Campaign of 2004 now that reasonable grounds existed to believe there might be other misuse of Air Force One, and that it would be important for public confidence in government as well as according to proper legal standards to investigate this further to (1) clear Rove and the White House of any wrongdoing that was not inadvertent, or (2) show it was a deliberate pattern to misuse official agencies or arms of the Executive Office of the President to elect officials, in violation of the Hatch Act, and the regulations pertaining to use of U.S. Treasury funds.

35. The White House Counsel's office refused to cooperate in investigation of the Rove Complaints. Plaintiff used several means to try to obtain cooperation, including calling Deputy White House Counsel several times, sending letters by telefax and regular mail to the

White House Counsel's office, and having the OSC Hatch Act Unit call their Associate White House Counsel contacts for further cooperation. Despite these efforts in January and February of 2006, the White House was silent and resisted eforts to obtain information and documents. As a result Plaintiff instructed the Hatch Act Unit to prepare and forward to the White House an administrative demand for documents and interrogatory answers. The White House did not respond and continued to refuse to cooperate in Plaintiff's legally authorized investigations pursuant to two complaints filed with his office.

36. As a result, Plaintiff instructed his Hatch Act unit to consider a subpoena which would have to be enforced through the statutes of OSC, ultimately through a federal court of competent jurisdiction. In order to avert a standoff and get the investigation completed, Plaintiff instructed his director of congressional and public affairs to call a contact he had in Karl Rove's Office of Political Affairs, and explain the situation and ask for cooperation so OSC could do its job.

37. Within two days, in early March, 2006, the White House sent an emissary from the West Wing to meet with Plaintiff and explain to him that the White House was unhappy with Plaintiff's letter to Clay Johnson objecting to the OPM-IG investigation as having conflicts of interest, transactional to the complaint against Plaintiff, as well as structural relating to the requirement that Plaintiff would have to get OPM's permission as required by statute to appeal any case before the MSPB if Plaintiff or OSC lost under the complaint. Such appeal to the federal court would be compromised if OPM was involved in any way in the underlying investigation of the Complaint that might end up before MSPB if the aggrieved employees

sought to obtain corrective action at MSPB as would be their right if they were not satisfied with the outcome of the investigation.

38. This emissary from the White House also informed Plaintiff that Clay Johnson and the West Wing of the White House wanted him to leave his job, that nobody wanted an inspector general investigation on their record, and if Plaintiff left quietly, the inspector general investigation would likely fade away as resources tend to get put elsewhere when someone leaves office, and the investigation had not really begun. Plaintiff was further told that the emissary knew of several large law firms where he had contacts and with Plaintiff's background and experience, "gold in this town," he could get a good job. The emissary also said he would go to the White House within six months or so if Plaintiff cooperated, and seek a judgeship for Plaintiff either on the federal circuit or the federal court of claims. This individual made it clear he had spoken with individuals in the West Wing and what he was saying was based on personal knowledge of the White House wanting Plaintiff to leave office now.

39. Plaintiff refused to leave office and insisted on the OPM-IG and OPM Director recusing themselves due to applicable government ethics rules, Inspector General guidelines, and the laws of conflict of interest. They could not and would not fairly, impartially or otherwise properly and lawfully investigate the complaint, and had already made it clear through acts, words, and letters, that they intended to do an investigation of Plaintiff for the White House for the purpose of finding malfeasance, neglect of duty, and inefficiency in office to help the White House oust Plaintiff as it had been trying to do since March of 2004 when Plaintiff caused havoc for the President on his reelection efforts due to Plaintiff's announcement of a legal review to

determine the lawfulness of OSC attempting to enforce rights for discrimination on the basis of "sexual orientation," something not in OSC's statutes and already rejected by the court that binds OSC, the MSPB, as described above.

**Attempts by OPM IG to Violate the Law and Impede Plaintiff's Duties by Defendants**

40. The following acts were committed by defendants, in conspiracy with one another during the times of 2007-20010, without limitation, by way of example:

- Intimidation of employees of the U.S. Office of Special Counsel to be disloyal to Plaintiff Scott Bloch
- Conduct of investigations of Plaintiff Scott Bloch and wife Catherine Bloch beyond the scope of any investigations permitted by law, of which there were none permitted, but one that was forced illegally to occur over Scott Bloch's objection and authority to exclude.
- Attempt and actual interference in ongoing PPP and WB disclosure of FAA, Lurita Doan, Rep. Tom Davis, Jr., improper use of government for Republican National Committee races, improper use of government resources to cover up same, and other improper diversion of contracting funds and use of government authority to divert appropriated monies to Lurita Doan and her company to improperly influence investigations against Bloch and to improperly advance RNC races and special interest groups
- Attempts and actual interferences by interest group defendants and their lawyer, Katz and Katz Marshall & Banks, LLP, and cover up of same;

- In spite of being turned down, OPM IG, Jill Maroney, David Cope, and Patricia Marshall, in conjunction with Clay Johnson and Jim Byrne, permitted OPM IG to stray far beyond the complaint for which it had long since violated the Economy Act Agreement with OSC.
- Attempts by Executive Office of President in conspiracy with third parties to disrupt and retaliate against Special Counsel Scott Bloch for his actions in enforcing USERAA and the Veterans benefits Improvement Act of 2006 and the embarrassment Scott Bloch was causing to the White House, Departments of Labor and Defense (DoL and DoD) over and over with publicity and enforcement that the administration did not want.
- Intimidation of staff and attempts to force their way into agency, statements at outset that OSC was obstructing, all attributed to me.**[insert facts]**
- Retaliation against Plaintiffs including leaks to press, accusations of "obstruction" in 2007 and in 2009, 2010 and 2011
- Falsifying law to the Congress and to the Press
- E mailing employees of the Office of Special Counsel to disrupt business and undermine authority and investigations
- Undermining whistleblowers and their investigations and their awards ceremonies
- Misusing role as lawyers to unethically interfere with OSC business

- Repeating lie after knew utterly false, getting Senate to repeat, causing fraud to be injected into legal process and oversight process.
- OPM IG and OPM working with outside groups, and with Elaine Kaplan to try to disrupt our work and oust me, NTEU HRC, POGO, GAP and PEER

41. In January 2006, Rebecca McGinley, Acting Deputy Special Counsel, was the person in charge of monitoring and acting as liaison at OSC regarding the unlawful investigation of Plaintiff, to make sure OPM acted in accordance with the law, the Economy Act agreement, and in conformity with their agreement to perform their investigation timely (within the 12 weeks and the budget outlined in 2006), and according to OSC's laws, rules, regulations, policies and procedures. Yet, OPM and its IG always acted outside the Economy Act agreement, in violation of OSC's laws, rules, regulations, policies and procedures. In 2006, McGinley wrote to Clay Johnson setting forth multiple violations by OPM-IG. Prior to these violations then Deputy Special Counsel James McVay had written by letter, e mail, and by telephone, and informed OPM that it was in violation of the law, its agreement and was conducting the investigation in breach of law, procedure and agreements. These pieces of correspondence set forth intent to find malfeasance by OPM and Inspector General Patrick McFarland, and by Jill Maroney, Agent in Charge, and her lawyers at OPM, Patricia Marshall and David Cope, setting forth their stated intent to Deputy James McVay and to Rebecca McGinley intent to find neglect of duty, malfeasance and other ways to get Special Counsel Bloch out of office.

**Complaints Filed with OSC Against Rove, Doan, DoJ, and others in the Administration**

42. In addition to the controversy surrounding his reinterpretation of 5 U.S.C. § 2302

and reorganization of OSC, during his tenure at OSC, Plaintiff has overseen several high-profile, politically-charged investigations. *See, e.g.*, Tom Hamburger, "Bush Appointee Turns the Spotlight Inward; Prosecutor Scott Bloch, a Devoted Conservative, Unsettles the GOP With His White House Probe," *The Los Angeles Times*, May 1, 2007 at A1; Chitra Ragavan, "Putting the Squeeze on: Democrats Widen Their Probes, and a Controversial Bush Insider Chimes In," *U.S. News & World Report*, May 14, 2007 at 44.

42. Included among the matters Plaintiff oversaw during his tenure at OSC are investigations into whether White House Deputy Chief of Staff Karl Rove and his staff violated the law by giving briefings to agency heads and government employees about Republican electoral prospects (and how the agency could support those prospects) and key congressional races, whether Rove made improper use of Republican party e-mail accounts while working at the White House, and the subsequent disappearance of Rove's e-mail records, and whether the administration used official authority and resources of agencies to help Republican candidates get elected nationally (such as by using the agencies to deliver pork projects to an electorally vulnerable Congressman).

43. Under Plaintiff's leadership, OSC also undertook an investigation into the legality of the firings of U.S. Attorney David Iglesias and seven other U.S. Attorneys.

44. Plaintiff also oversaw an investigation into whether then-National Security Advisor Condoleezza Rice used her official authority for improper purposes in violation of the Hatch Act during the President's 2004 reelection campaign. OSC ultimately found no such misuse of authority by Rice.



[redacted]

45. Also in 2008, Plaintiff oversaw a broad investigation into whistleblower complaints by employees of the Federal Aviation Administration, which lead to significant, adverse public attention to airline safety compliance and the grounding of several thousand airliners for safety inspections. *See, e.g.*, Christopher Conkey, "Special Counsel Has Hands Full with FAA," *The Wall Street Journal*, June 12, 2008 at A4.

46. Also under Plaintiff's leadership in 2008, OSC commenced an investigation into allegations that the Justice Department rejected job candidates because of their political beliefs. *See, e.g.*, Eric Lichtblau, "New Scrutiny of Hiring at Justice Department," *The New York Times*, July 2, 2008 at A13.

47. Plaintiff also had investigated GSA Administrator Lurita Doan for engaging in illegal political activities in violation of the Hatch Act. In June 2007, Plaintiff recommended that Doan be disciplined for her conduct, and, ultimately, Doan was forced to resign on or about April 29, 2008. Upon information and belief, Doan has close ties to Rep. Tom Davis (R-Va.), the Ranking Member of the House Oversight and Government Reform Committee. Rep. Davis had been very supportive of Plaintiff's work as Special Counsel until Plaintiff began investigating Doan. In or about 2003-04, Doan and her husband gave approximately $500,000 to the Republican National Committee, George W. Bush for President, and various candidates across the country as directed by Tom Davis for use as chair of the National Republican Congressional Committee to get Republicans elected to Congress in important or hotly disputed races. On information and belief, Davis and his wife were involved in helping Doan to become successful in her business, NMTI, which she sold in or about 2005 for an estimated $200,000,000.

48. During her time in obtaining government contracts, Doan used her husband's position at the Department of Homeland Security to bid for contracts for her technology company or obtain non-public information, which was contrary to government laws. On information and belief, Defendants Davis, Doan, McFarland, Maroney, Cope, and Fielding knew that Plaintiff was investigating Doan for this, following his explanation to Davis and Fielding that he believed he had to consider making a criminal referral of Doan's utter failure to cooperate in the investigation, and creating extra work on false statements and other acts of obstruction through Davis and Fielding, when they authorized the grand jury investigation, and raid on Plaintiff's home and office, and the very public nature of that raid, in contravention of law.

49. In approximately November 2007, OPM-OIG learned that, in December 2006, Plaintiff had asked his staff to make arrangements for an outside computer specialist firm, Geeks on Call, to recover as many documents as possible from Plaintiff's malfunctioning laptop computer and to restore the government-issued laptop to working condition remove any remnant of corruption or virus, and preserve on external drives Plaintiff's files that were personal in nature (except for attorney client privileged, work product privileged, LES sensitive investigations of a PCIE/IC directory, and files relating to referral to IC of the complaint against Plaintiff by interest groups and anonymous employees). Plaintiff had made this request after OSC's in-house technical staff was unable to correct the computer problem. The total cost of the work performed by Geeks on Call was less than $1,200.00. Plaintiffs are informed and believes and thereon allege that OPM-OIG obtained records of the work performed by Geeks on Call and maintained these records as part of its investigatory file pertaining to Plaintiff.

50. Also in November 2007, various news organizations, including *The Wall Street Journal*, reported that Plaintiff had hired Geeks on Call to service his government-issued laptop. *See, e.g.*, John R. Wilke, "Head of Rove Inquiry in Hot Seat Himself," *The Wall Street Journal*, November 28, 2007 at A6. On information and belief, OPM-OIG intentionally disclosed information about Plaintiff's hiring of Geeks on Call to members of the media, including *The Wall Street Journal*, and/or to Rep. Davis, in order to discredit Plaintiff by insinuating that he intentionally destroyed documents relevant to the OPM-OIG investigation.

51. Shortly thereafter, Rep. Davis caused the House Committee on Oversight and Government Reform to commence an investigation into the Geeks on Call matter. Plaintiff cooperated fully with the investigation, including giving a transcribed interview on or about March 4, 2008. Defendant maintains records pertaining to Plaintiff as part of a system of records. More specifically, Defendant's Office of Inspector General ("OPM-OIG") maintains investigatory records pertaining to Plaintiff as part of a purported investigation of a matter pending before OSC, the legality and propriety of which investigation and investigative authority Plaintiff contests. Plaintiffs are informed and believes and thereon allege that included among OPM-OIG's records pertaining to Plaintiff are records of work performed by an outside computer specialist firm, Geeks on Call, on Plaintiff's malfunctioning, government-issued laptop computer. In approximately mid-November 2007, Defendant intentionally or willfully disclosed records pertaining to Plaintiff and/or the contents of records pertaining to Plaintiff to members of the media, including *The Wall Street Journal*, and/or Rep. Tom Davis (R-Va.) in violation of the Privacy Act and Plaintiff's rights under the Privacy Act.

52. More specifically, in mid- to late-November 2007, a reporter for *The Wall Street Journal* informed Plaintiff that lawyers at OPM-OIG had shown him records from OPM-OIG's purported investigation of Plaintiff, including records of the services performed by the outside computer firm on Plaintiff's laptop computer.

53. On information and belief, officials of Defendant conspired with other persons and/or entities, including but not limited to persons within the Executive Office of the President and or members of Congress, including Rep. Davis, to violate the Privacy Act, cause damage to Plaintiff, and harm Plaintiff's ability to carry out the duties and responsibilities of his office, as the Geeks on Call matter was outside the scope of any investigative authority Defendant may have had under an Economy Act between Defendant and OSC.

54. At no point did Plaintiff consent to Defendant's disclosure(s), in writing or otherwise, of any records pertaining to him. Defendant's intentional and/or willful disclosure(s) resulted in substantial, negative public scrutiny of Plaintiff, including adverse media reports (*see, e.g.*, John R. Wilke, "Head of Rove Inquiry in Hot Seat Himself," *The Wall Street Journal*, November 28, 2007 at A6; Elizabeth Williamson, "U.S. Special Counsel Says He Won't Provide Files," *The Washington Post*, November 30, 2007 at A3) and an investigation of Plaintiff by the House Committee on Oversight and Government Reform.

55. As a proximate result of Defendant's intentional and/or willful disclosure(s), Plaintiff suffered substantial damages, including but not limited to loss of reputation, emotional distress, and out-of pocket expenses. OPM IG and OPM's director, conspired with third parties, including Clay Johnson, Tom Davis, and his staff, to accomplish this accusation that Plaintiff

was obstructing the investigation, when such was untrue, and Defendants knew or had reason to know that Plaintiff did not destroy documents using Geeks on Call but rather *preserved* all documents that had almost been lost due to a computer malfunction, and that the vast majority of those documents were personal in nature.

56. Davis conspired with Doan and her attorneys and other third parties including Defendant Clay Johnson, Fred Fielding, Patrick McFarland, Jill Maroney, and others to defeat Plaintiff's right to be in office, to conduct his investigations, and to be free from harassment and unlawful investigations and accusations given to the public.

57. Defendants Inspector General McFarland and Special Agent Jill Maroney, and attorney David Cope and Patricia Marshall, all conspired to unlawfully usurp Plaintiff's authority to subpoena under Planitiff's statutes. It is a power held only by Special Counsel, and cannot be delegated except by express delegation by the Special Counsel. It cannot be redelegated under the Special Counsel's authorizing statutes, but only delegated by express act of Special Counsel. The Deputy Special Counsel did not and could not delegate OSC's subpoena power to OPM-IG or any of its employees, and OPM-IG lacked its own subpoena power in OSC because it lacked any statutory authority at OSC. Despite knowing this, and having had such discussions with Deputy Special Counsel, McFarland sent a subpoena on OPM-IG letterhead demanding Plaintiff's flash drive of documents that had been provided by Geeks on Call, and also Plaintiff's personal AOL e mail account. This was a result of a hearing in July of 2007 before Davis's committee and the aftermath where Congressmen Davis and Congressman Mica demanded Plaintiff turn over to Congress his private e mail based on Plaintiff sending a personal e mail to

over fifty friends, sending articles on Doan and Davis, after Plaintiff had completed the investigation on Doan's violations of the Hatch Act at GSA.

58. Davis made it clear he "had a deal" with the White House that if Doan went the Inspector General Miller would be fired, and informed Plaintiff of that on July ___, 2009, in order to intimidate him and send a message that he could have heads roll if Plaintiff continued to make a criminal referral or otherwise continue to investigate Doan. He made it clear he had a problem with OSC's findings and wanted Plaintiff to defend those findings the next day at the five-year Reauthorization Hearing before Davis and the House Oversight and Government Reform Committee, subcommittee on Federal Workforce. There was a court reporter in this hearing. Davis attacked Plaintiff with private e mails, then following the hearing, Plaintiffs are informed and believes and thereon allege that he and other defendants conspired with McFarland and Maroney to issue a fictitious subpoena on OSC letterhead by McFarland, conspiring with Davis to get personal e mails from Plaintiffs, and otherwise sought to interefere with the privacy of Plaintiffs, and caused the raid of FBI and OPM agents to occur on May 6, 2008, without authorization, legal authority or proper reasons.

59. On or about May 6, 2008, only days after GSA Administrator Doan was forced to resign and in full view of the media, Plaintiff's office at OSC and Plaintiff's residence were raided by FBI and OPM-OIG personnel executing wide-ranging search warrants for records concerning the Geeks on Call matters. The media was present as the FBI and OPM-OIG arrived at Plaintiff's residence and place of work, terrifying his wife and small children. The search warrants also sought records concerning Plaintiff's investigations of Secretary Rice and GSA

Administrator Doan, and all of the sensitive pending investigations of the White House and the Department of Justice and FAA, among other pending matters.

60. This raid seized sensitive files and investigation materials at Plaintiffs home and office, that pertained to Doan and Davis and their conspiracies aforementioned, including illegal use of public authority to divert appropriated funds for campaigning of RNC and NRCC and the bidding of the White House, Rove, and the RNC generally. Plaintiffs are informed and believes and thereon allege that the OPM agents seized materials at Plaintiff's home including information pertaining to strategy for uncovering the ways in which Davis and Doan used the contracting monies Doan obtained to divert to RNC and NRCC races and to help Davis run for Senate and to help Rove and the RNC court Black entrepreneurs for the RNC for further elections.

61. They also seized sensitive investigation materials pertaining to the FAA aviation oversight that had just concluded a couple of weeks before the raid.

62. In 2007 and 2008, Davis and his staff hauled JR Sanchez and Loren Smith and others up to hill, inquired into confidential and private matters that were none of the business of Davis. They conspired with third parties to obtain other confidential information, then asked Sanchez, "Is Bloch planning to sue the President?" "Is Bloch planning to write a book, is he writing a book."

63. Plaintiffs are informed and believes and thereon allege that Davis, Doan, Staff of Davis, and IG conspired on a regular basis, interacting with PEER, POGO, GAP, Ruch, Kaplan, Katz and her law firm.

64. Plaintiffs are informed and believes and thereon allege that lawyers from Katz Marshall as well as Katz herself, injected themselves into OSC's private business, and asked JR Sanchez who had a case with his wife at Katz's firm, and she was supposed to be walled off from the case, but when Sanchez and his wife appeared at the firm, she came in and injected herself unethically into the case and began to ask her client about Scott Bloch, and were privy to the Leroy Smith disruption of the whistleblower award, and when Sanchez was there for mediation, Katz again unethically inquired into Bloch and the OSC whistleblower award indicating she was party to the entire scheme that day. Later, after Sanchez left Bloch's employment as his confidential adviser, Katz had her partner call over to Sanchez and ask him to talk against his old boss, Bloch, thus unethically and fraudulently interfering in the relationship and attempting Sanchez to violate his oblilgations and duties to bloch that were fiduciary and continuing in nature, and to use the power of her relationship with him and his wife to induce him to say false things about Bloch.

65. Plaintiffs are informed and believes and thereon allege that all of the above persons did the same with Jim Byrne, Jim Mitchell, Doan, Davis, IG McFarland, Maroney, Cope, Katz, Kaplan and others conspired withi Fred Fielding as set forth below.

**Civil Conspiracy of Katz, Kaplan, Katz Marshall & Banks, Divine, GAP, Ruch, PEER,**

65. Plaintiffs are informed and believes and thereon allege that the invividuals named herein worked with IG McFarland and Davis, and other groups, to try to destroy Plaintiff's standing, his position, and his agency's ability to conduct business, conspired with persons inside OSC to disrupt management of the agency, initiatives and investigations, threatened employees,

confidential employees, intimidated employees, corruptly tried to influence the White House, Congress and the OPM and its IG to perform acts that were illegal, improper, and designed to prejudice the process of the investigation and cast Plaintiff into a false light publicly.

66. Additional leaks by Defendants out of OPM Investigation in combination and individually by Defendants include but are not limited to:

a. Dress Code article, flap. Stupid but happened: http://www.washingtonpost.com/wp-dyn/content/article/2006/09/06/AR2006090601771.html

b. Jeff Ruch of PEER one of complainants e mailing everyone in agency to get ahold of Inspector General and cry out against me and Rebecca McGinley.

c. Interference in our Leroy Smith whistleblower award ceremony, articles, working with Katz, OPM, Ruch, and Senate oversight committee staffer, Jennifer Tyree, which they then asked me about in Senate hearing in 2007 (February, March?). http://www.washingtonpost.com/wp-dyn/content/article/2006/09/10/AR2006091000790.html

d. Geeks leak, Nov. 27, 2007. Byrne and Mitchell felt OPM and WH trying to get me into obstruction and false statement charges. Byrne also told me story, which I now believe was his way of warning me to get out of office, about a person he knew in Energy Department who tried to stand up to IG, and they "ruined this guy's life. He's still without work and totally ruined."

67. On or about July 18, 2008, Plaintiff's Deputy, Defendant James Byrne, resigned from OSC to work for , and, in so doing, on information and belief, provided copies of his resignation letter to the White House and/or the media.

68. On August 1, 2008, Plaintiff was summoned to the White House to meet with Defendant Fred F. Fielding, Counsel to the President. At the meeting, Defendant Fielding presented Plaintiff with a letter threatening to remove him from office for "inefficiency and neglect of duty." *See* Exhibit A (hereafter "August 1st Letter"). In the August 1st Letter, Defendant Fielding wrote: Controversies and allegations during your tenure have distracted the Office of Special Counsel from meeting its most fundamental mission . . . I believe that your conduct in office, reflected in the attached material, constitutes inefficiency and neglect of duty, grounds for removal under 5 U.S.C. § 1211. Accordingly, I am prepared today to recommend to the President your immediate removal from the position of Special Counsel. Defendant Fielding gave Plaintiff three business days to respond."

69. The attachments to the August 1st Letter consisted primarily of a series of letters written by or on behalf of the disgruntled OSC employees and advocacy groups who are Defendants herein, who filed the March 2005 complaint under investigation by OPM-OIG. These documents are as follows:

• Four letters from attorneys representing the complainants in the matter under investigation by OPM-OIG, including one letter complaining not about Plaintiff, but about OPM-OIG's failure to conclude its investigation;

• Three letters from the advocacy groups that joined as complainants in the matter under investigation by OPM-OIG;

• A letter from Rep. Henry Waxman, Chairman of the House Committee on Oversight and Government Reform to Plaintiff asking him to resign in light of the resignation of Plaintiff's deputy;

• A letter from Rep. Davis to Rep. Waxman calling for Plaintiff's resignation;

• The letter of resignation of Plaintiff's deputy; and

• Four news articles concerning the May 6, 2008 search of Plaintiff's office and residence.

70. Not only does the August 1st Letter fail to identify any specific, alleged instances of inefficiency or neglect of duty by Plaintiff, but the underlying matters referenced in the documents attached to the August 1st Letter have never been verified or substantiated in any manner, much less adjudicated before an impartial and unbiased factfinder. As Defendant Fielding acknowledged in the August 1st Letter, the attachments merely describe "[c]ontroversies and allegations" that are alleged to have "distracted" OSC.

71. Similarly, the August 1st Letter fails to set forth any verified or substantiated facts demonstrating that the "[c]ontroversies and allegations" cited by Defendant Fielding actually have distracted OSC or otherwise undermined Plaintiff's efficiency or caused him to neglect the duties of his office. Such is demonstrably not the case as reflected by even a cursory review of OSC's official website.

72 While the statutory authority to remove the Special Counsel rests solely with the President, on information and belief, the President has delegated to Defendant Fielding the obligation to provide Plaintiff with notice of the allegations against him and an opportunity for a full and fair hearing.

73 As demonstrated by the August 1st Letter, Defendant Fielding is not impartial, but already had concluded that Plaintiff should be removed from office before Plaintiff was afforded the opportunity to address the "controversies and allegations" set forth in the attachments to the August 1st Letter.

74. Defendants also failed to afford Plaintiff a sufficient opportunity to respond to his proposed removal. The original deadline of three business days subsequently was extended by a mere two business days.

75. Plaintiff submitted a written response to the August 1st Letter to Defendant Fielding on August 8, 2008. *See* Exhibit B (hereafter "Bloch Letter").

76. On October, 2008, Defendant Fielding informed Plaintiff's counsel that "they were going to move on your client" if he would not agree to go on administrative leave.

77. Plaintiff's statutory five year term as Special Counsel is not due to expire until January 5, 2009. By statute, Plaintiff can hold over for up to one year until the new administration nominates and the Senate confirms a new Special Counsel. No such person has been nominated as of this date.

78. Plaintiff was managing many sensitive investigations of high-profile and politically charged matters associated with the White House and the Department of Justice, and the aviation industry and the FAA. These investigations were reaching a critical point as the end of the Bush Administration nears. Two task forces had been formed by Plaintiff, and an increase of nearly ten percent in his budget had been granted to deal with these dozens of far-reaching investigations. They were resulting in much press attention.

79. In late October, 2008, Plaintiff was summoned to the White House to meet with the Director of Presidential Personnel who was unknown to Plaintiff. Plaintiff went to the White

House and met with her in the West Wing. When Plaintiff entered her office, Defendant Fielding was sitting there. Plaintiff informed him it was inappropriate for him to meet like this without Plaintiff having his counsel present. Defendant Fielding leaned forward and stated that he had called Troutman Sanders that morning and they no longer represented him. Plaintiff informed him that he had other counsel at Judicial Watch and it was not appropriate. Defendant Fielding proceeded to inform Plaintiff that the President had decided to remove Plaintiff unless Plaintiff agreed to administrative leave through the end of the term, which Fielding said was December 12, 2008, not January 5, 2009. Defendant made it clear that Plaintiff's agency had already been forcibly taken over by Federal Protective Service while Plaintiff had come to meet at the White House.

80. The constructive removal of Plaintiff from his office as Special Counsel interfered with and will continue to interfere with these important investigations and has caused and will continue to cause substantial disruption to these investigations, the independence of the OSC, and Plaintiff's reputation.

81. The removal of Plaintiff from his office as Special Counsel also denied Plaintiff his statutory right to function as Special Counsel until his term expires on January 5, 2009 and deprives him of both his office and his employment.

82. The take over of the agency by force was wrongful, unlawful, done to impede and obstruct investigations by Plaintiff, and was not done pursuant to any lawful finding of malfeasance or neglect of duty. Indeed, Defendant EOP and Fielding took over the agency without any such finding, and only under a threat of making such finding and with the knowledge that the agency had been forcibly taken over, and another person put in Plaintiff's place as Special Counsel, did Plaintiff agree to accept the administrative leave – having no other

choice, and having been removed by force and many of his personal belongings kept from him by Federal Protective Service, and still held to this day.

83. In addition, EOP and Defendant Fielding agreed that no comment would be made by the White House about being placed on administrative leave, or any other implication that Plaintiff had been forcibly removed, and yet as soon as Plaintiff informed Fielding, the White House became a sieve of information to the press about Plaintiff being forcibly removed and placed on administrative leave.

84. When Plaintiff's attorneys demanded for the second time that OSC and DOJ pay for the defense of Plaintiff because all actions were directly implicating his policy decisions in office, his discretionary administrative and prosecutorial and managerial decisions, all lawful and provided for in statutes and regulations, Defendant Byrne provided the confidential letter to Defendant James Mitchell, who was Plaintiff's confidential political Schedule C appointee, chief of communications, and a non lawyer who had no business seeing or having any say in whether fees should be reimbursed that had been incurred, or were to be incurred in the future. The letter to Byrne reflected that Byrne on several occasions had approved the hiring of Troutman Sanders LLP to defend Plaintiff in the jurisdictionless, unlawful and coerced administrative investigation by OPM and its IG, that had been commissions by President Bush's close friend, Clay Johnson, who was also in charge of outreach to the Log Cabin Republicans in the Bush Administration and outside of it. Johnson had demonstrated personal bias and animosity toward Plaintiff.

85. The letter to Byrne also reflected his promise to Troutman Sanders LLP that fees would be covered and that he was ordering a check. This was after over Seventy Thousand Dollars in fees had been incurred because of Byrne's giving the go ahead to hire Troutman Sanders LLP and instructions to Plaintiff to send him the invoices and that they would be paid at

the appropriate time. This occurred after numerous phone calls with Byrne and Troutman Sanders LLP explaining that it was authorized and the bills were in line for payment. The Grand Jury Investigation and OPM/FBI joint investigation of Plaintiff was nothing more than a continuation of the OPM investigation, only adding in things that were way beyond the scope of the Complaints of Katz, Kaplan, POGO, HRC, GAP, PEER, and anonymous employees. In fact, OPM IG had been attempting to operate beyond the scope of the Complaint from the outset, and many times had to be reined in by Deputy Special Counsels or by the White House and denied official permission to go beyond the four corners of the Complaint, which OPM never completed the investigation of within the Economy Act contract.

**Leaks out of Grand Jury and OPM Continuing Tainted Investigation**

86. Additional leaks from GJ investigation, and something that shows Katz, and one of complainants (POGO) in complaint OPM investigating (and now investigating with FBI and USAttorney) working together with Tom Davis requesting my ouster – only two days after raid:

a. http://www.washingtonpost.com/wp-dyn/content/article/2008/05/07/AR2008050703971.html
b. Davis was trying to manipulate this to happen all along.
c. Misconduct by USA and DOJ
d. Memo has to do with all of my investigations against Bush administration was improperly leaked to POGO. http://pogoblog.typepad.com/pogo/2008/05/internal-draft.html
e. It contains attorney client privileged and draft. http://pogoarchives.org/m/wi/osc-tf-summary-20080118.pdf.

87. During the GJ investigation, repeated comments were made by the Defendants evidencing bias, prejudgment, vindictive and selective prosecution, including NPR pieces on the Plaintiff Scott Bloch's plans to write a book on corruption in Washington, D.C., as well as many

aspects of the investigation including having others place positive comments about Plaintiff's achievements on blogs or in media, and various attempts to place Plaintiff in a false or disparaging light such as purchases under his decorating budget provided by Congress for towels or other items. For example the following:

a. http://www.usnews.com/blogs/news-desk/2007/04/27/watchdog-groups-raise-red-flags-over-special.html

b. Seized attorney client communications with Reg Brown of Wilmer Cutler, they have notes of my conversations with him in 2005 and 2006 and later, either in hard copy or on computer in my h drive and also on my flash drive. I saw some of those in the three boxes of documents produced to us to look over in Oct. 2009 with Dan Cox and Michael Marr, which Dan Burton had, but also had been marked up and flagged by OPM and Maroney.

c. Bloggers, in June 2008

   i. http://www.nextgov.com/nextgov/ng_20080618_4680.php

   ii. Plaintiffs are informed and believes and thereon allege that the interest groups working with Jill Maroney or her confidantes at OPM would get the information, give it to Dan Friedman (who also used to be at Federal Times), and they would put out the information of what OPM got through raid or through the GJ investigation.

d. That there was investigation, brought press to the raid

   i. http://whistleblower.typepad.com/all_things_whistleblower_/2008/05/fbi-agents-raid.html

   ii. http://whistleblower.typepad.com/all_things_whistleblower_/2008/05/the-morning-aft.html

e. Did stories nationally in May 2007 and on from there, every time asked, confirmed there was investigation of GJ, spokesman for US atty office

   i. http://whistleblower.typepad.com/all_things_whistleblower_/2008/10/full-speed-ahead.html

   ii. http://themoderatevoice.com/19418/fbi-raids-special-counsel-office/

iii.**The fact of Specialy Counsel towels being made with seal of OSC made, using authorized decorating budget provided by Congress, and a big screen tv mounted on wall in office, also using the same budget**

2. Fresh Details Emerge In Special Counsel's Ouster
3. http://www.npr.org/templates/story/story.php?storyId=96184109 October 28, 2008 ... But even when FBI agents staged a high-profile **raid** on **Bloch's** home and office last May, the White House did not take any action. ... By Ari Shapiro http://www.npr.org/templates/story/story.php?storyId=96184109
4. FBI Raids Special Counsel Office, Seizes Records
5. http://www.npr.org/templates/story/story.php?storyId=90223448 May 06, 2008 ... into allegations that **Bloch** retaliated against career employees and obstructed an investigation. Sources close to the probe said the FBI's **raid** this morning ... By Ari Shapiro http://www.npr.org/templates/story/story.php?storyId=90223448
6. Bush Shuns Advice To Fire Special Counsel

July 18, 2008 ... Special Counsel's office. And in May, dozens of FBI agents stormed **Bloch's** home and office in a surprise **raid**. A grand jury has ... By Ari Shapiro

http://www.npr.org/templates/story/story.php?storyId=92671738

7. **Morning Edition**

Federal Agents Investigate Whistle-Blower Agency

August 29, 2008 ... But spokesman Mitchell said there was no **raid** in Dallas. Scott **Bloch** has been a controversial figure since he started as special counsel in 2004. ... By Ari Shapiro

http://www.npr.org/templates/story/story.php?storyId=90245837

Listen Now Add to playlist

8. **All Things Considered**

Special Counsel Staff Feared Being Seen as 'Disloyal'

May 07, 2008 ... Scott **Bloch** had an autobiography in the works when yesterday's FBI **raid** took place. The book's working title: "Corruption in the Capital.". ... By Ari Shapiro

http://www.npr.org/templates/story/story.php?storyId=90259932

**Integrity Committee, on which McFarland, IG OPM sat with me, refused to allow me to sit with them after the raid, even though I was on the committee and had a duty and right to deliberate on all cases of IG invesgtiations pursuant to Executive Order. FBI was talking to the chair of IC, can't think of his name, but he was head of CID. I met over with them frequently. Wrote Clay Johnson demanding that I immediately be placed back on committee, warning him that all**

investigations were irregular and subject to attack since the committee had not been properly convened. I think that letter went to them in Sept. 2008 at WH and to FBI.

a. They were stripping me of duties before I ever left office.

9. Leaks to Press of "going to do thorough investigation" of me, by OPM's press office, unheard of when PCIE or Integrity Committee or anyone else does investigation, shows early interaction and conspiracy with outside groups, Congress, and WH by OPM. Would never have done press release in Oct. 2005 without all those groups approving and putting pressure on them to do so. Highly out of ordinary. Is Privacy Act violation as well.

10. Leak of "Bloch is Obstructing" to Wash. Post after privacy act protected and confidential meeting at WH in late Jan or early Feb. 2007, after my new Deputy Jim Byrne met with the IG, Pat McFarland, his Deputy IG, and Clay Johnson at the WH.

    a. Here's the article, "Special Counsel Accused of Intimidation in Probe" and is replete with use of term "obstruction," but not referring to my actions but those of my deputy. This came from OPM purely, using Ruch and PEER and other groups, and Elaine Kaplan, to do the fronting. http://www.washingtonpost.com/wp-dyn/content/article/2007/02/15/AR2007021501725.html

**COUNT I**
**(Deprivation of Property Without Due Process of Law – Violation of the Fifth Amendment to the U.S. Constitution)**

88. Plaintiff realleges paragraphs 1 through 87 as if fully stated herein.

89. Plaintiff enjoys a property right in his continued tenure and employment as Special Counsel.

90. Defendants have deprived Plaintiff of this property right without due process of law in violation of the Fifth Amendment to the U.S. Constitution. Specifically, Defendants have caused Plaintiff to be removed without adequate notice and an opportunity for a full and fair hearing of the allegations against him before an impartial decision-maker.

91. Defendants have further violated Plaintiff's property right by removing him from

office based on allegations that, individually or collectively, are facially insufficient to sustain any finding that Plaintiff's conduct constitutes inefficiency or neglect of duty.

92. Plaintiff has been irreparably harmed by reason of Defendants' violation of his constitutional rights.

**COUNT II**
**(Declaratory and Injunctive Relief – Violation of 5 U.S.C. § 1211)**

93. Plaintiff realleges paragraphs 1 through 51 as if fully stated herein.

94. Defendants actions to remove Plaintiff and to investigate him in violation of his statutes, with ongoing investigations and intent to harm his reputation, without any statutory or other authority, using illegal and improper means including fictitious authority, without providing adequate notice and an opportunity for a full and fair hearing before an impartial decision-maker and without proper cause violates 5 U.S.C. § 1211, which provides that Plaintiff can only be removed for cause, as the removal interferes with Plaintiff's statutory-established independence and otherwise harms his ability to carry out the statutorily-mandated duties and responsibilities of his office.

95. Plaintiff has been irreparably harmed by reason of Defendants' violation of his statutory rights.

96. That the actions of Defendants in conspiring to obstruct, interfere and impede Plaintiff in his official duties to destroy the credibility of his investigations against those who brought these actions against Plaintiff should be referred by the Court for an independent prosecutor to looking into charges against Defendants.

97. Plaintiff seeks a writ of mandamus to compel the Office of Personnel Management, Inspector General of Office of Personnel Management, to refrain from any further proceedings,

return all papers or copies thereof in its possession to Plaintiff, including all attorney client materials, deliberative process privilege papers, attorney work product papers, and all other papers in its possession, and to refrain from any further proceedings due to the taints, violations of Fifth Amendment Due Process, violations of Plaintiff's powers of office, violation of Separation of Powers, and illegalities of a far reaching nature pending further orders of this court for investigations into the actions of those who sought to defeat Plaintiff's powers in office and to prevent his inquiries into improper and illegal conduct in the United States Department of Justice, White House, and 26 agencies of the Executive Branch, and to further refrain from any illegalities in conspiring with third parties, and outside interest groups or those who had dealing with these matters prior to government service, pending further order of this court as to whether other misconduct has occurred in the Office of Personnel Management and the Inspector General's Office as well as the Integrity Committee, interference in prosecutorial decisions, staff and former Congressional member interference in OSC decisions, and Office of Personnel Management personnel interference and improper engagement in referrals for prosecuton.

**COUNT III**
**(Violation of Separation of Powers Doctrine)**

98. Plaintiff realleges paragraphs 1 through 54 as if fully stated herein.

99. Plaintiff's removal from office by Defendants without proper cause constitutes political interference with the head of an independent federal agency, contrary to Plaintiff's statutory right to function as Special Counsel as established by Congress. Furthermore, Defendants' actions undermine the independence of OSC and interfere with its proper functioning as mandated by Congress. Defendants' actions constitute a violation of the Separation of Powers Doctrine of the U.S. Constitution.

100. Plaintiff has been irreparably harmed by reason of Defendants' violation of the Separation of Powers Doctrine.

**COUNT IV**
**(Violation of the Privacy Act, 5 U.S.C. § 552a)**

101. Plaintiff realleges paragraphs 1 through 100 as if fully stated herein.

102. Defendant maintains records pertaining to Plaintiff as part of a system of records.

103. On information and belief, Defendants disclosed Privacy Act-protected records pertaining to Plaintiff and/or the contents of such records to members of the media and/or Rep. Davis without obtaining Plaintiff's prior written consent or other lawful authorization. The disclosure of other records, and outcomes of investigations by OPMIG, Davis' committee, and the Grand Jury, together with unauthorized disclosure by OSC, Davis, OPMIG or others of confidential legally privileged memoranda of the Task Force investigating Doan, Davis, the U.S. Department of Justice, the White House, Karl Rove, and others highly placed, was designed to thwart, embarrass and interfere with Plaintiff's execution of the duties of his office and prevent him from continuing to make progress in findings against the Bush Administration, and to unlawfully reveal privacy protected information to deter others from cooperating with OSC, Plaintiff, and the ongoing investigations, and to discredit those that had been occurring for over two years of Rove, the White House, the actions of the Office of Political Affairs, the President and Vice President during the 2004 election, and other highly sensitive and productive investigations.

104. Defendant's disclosure(s) violated 5 U.S.C. § 552a(b).

105. Plaintiff has suffered adverse effects, including but not limited to loss of reputation, emotional distress, and out-of-pocket expenses, as a proximate result of Defendant's

unlawful disclosure(s).

106. Defendant acted in a manner that was intentional and/or willful.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants: (1) declaring Defendant's conduct to be in violation of the Privacy Act, 5 U.S.C. § 552a; (2) enjoining Defendants from continuing to disclose Privacy Act-protected information about Plaintiff in the future; (3) awarding Plaintiff actual, compensatory damages, reasonable attorney fees, and the costs of this action; and (4) granting any and all other relief that the Court deems just and proper.

**COUNT V**
**(RICO and Conspiracy to Commit RICO, 18 U.S.C. § 1961 et seq.)**

107. Plaintiff realleges paragraphs 1 through 106 as if fully stated herein.

108. Defendants engaged in a RICO enterprise and conspired with one another using wire, mail, and other means, including commission of illegal acts, fraud, and other acts constituting predicate acts under RICO. On information and belief, these actions included but were not limited to:

a. Violating Plaintiffs' constitutional rights to religious liberty, trashing their personal property in their home including religious articles;

b. Converted Plaintiffs' personal property that was outside the scope of any investigation and outside of subpoenae issued by court having jurisdiction over Virginia residents;

c. Misued official authority to interefere with official acts of a federal officer to vindicate rights of whistleblowers, and conspired to violate U.S. and Virigina Statutes against

defamation, whistleblower rights, and other statutory provisions of law requiring particular conduct or refraining from particular conduct;

d. Knowingly violating U.S. Statutes, Appropriations laws, and other laws;

e. Committing fraud, perjury, and iterations of forgeries of subpoenas and official documents using telephone, telefax, wire, U.S. mail and property of the U.S. Government.

f. Attempting to obstruct investigations into improper use of government funds, and government power to advance RNC and other political groups.

g. Intimidation of witnesses.

h. Violations of the Whistleblower Protection Act.

i. Violations of the Privacy Act.

j. Violations of VA Code §§ 18.2-499 through -501.

109. Through these, and other illegal and improper actions, in conspiracy, Defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a RICO *enterprise* of individuals who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(b). The enterprise and RICO violations have been continuous since 2007 to the present and are based on a scheme to defraud and mislead the public and harm Plaintiffs and the U.S. Government, the Aviation Industry, and United States Citizens who fly in public aviation and who have an interest in their government being run without private political motives and misuse of power and appropriated taxpayer money.

110. Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) including wire and mail

fraud by using telephone and e mail to misrepresent to injured parties and the DOL and commit crimes under the DBA by denying claims using fraud and misrepresentation.

111. Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(b) *supra*.

112. Defendants did associate with a RICO *enterprise* of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce under the government contracts and appropriated monies used to carry out these acts.

113. Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO *enterprise* through a *pattern of racketeering activity*, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

114. Plaintiffs further allege that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(c) *supra*.

115. Defendants did conspire to acquire and maintain an interest in a RICO *enterprise* engaged in a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(b) and (d).

116. Defendants did also conspire to conduct and participate in said RICO *enterprise* through a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(c) and (d). 18 U.S.C. §§ 1961(4), (5) and (9).

117. In all the actions described in this complaint, defendants acted through their agents, officers, attorneys, representatives, through their officers, agents, attorneys and

managers, which were acting in the course and scope of employement or agency or representation for Defendants and the RICO enterprise described herein, and which defendant companies ratified all of the acts described in this complaint.

118. As a direct and proximate result of Defendants' racketeering violations, Plaintiffs were damaged, including having to engage attorneys and incur expenses and economic loss in excess of $2,000,000.00.

119. Under RICO, Plaintiffs are entitled to damages, treble damages, and attorneys fees and costs herein.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants: (1) declaring Defendants' conduct to be in violation of RICO; (2) enjoining Defendants from continuing in such racketeering activity in the future; (3) awarding Plaintiff actual, compensatory damages, treble damages, economic loss, and reasonable attorney fees, and the costs of this action; and (4) granting any and all other relief that the Court deems just and proper.

**COUNT VI**
**(Conspiracy to Interfere, Hinder Execution of Duties of Office, and to defeat Civil Rights of Whistleblowers and of Plaintiff, 42 U.S.C. § 1985)**

120. Plaintiff realleges paragraphs 1 through 1196 as if fully stated herein.

121. Defendants acted in a manner intended to and having the effect of interfering with and hindering Plaintiff Scott Bloch in executing the duties of his office as a federal officer with a statutory charge and oath of office, and a law enforcement badge with law enforcement powers, in violation of 42 U.S.C. § 1985 which provides:

**(1) Preventing officer from performing duties**

> If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

122. Defendants did either through force, intimidation, threat, or inducement through other means, did hinder and prevent Plaintiff Scott Bloch from lawfully discharge the duties of his office, and because of his discharge of the duties of office as set forth herein, did injure his property, molest, interrupt, hinder, or impede him in discharging his duties of office and also sought to and did drive him from office.

123. Defendants retaliated repreatedly against Plaintiffs legitimate rights and exercise of those rights, due to Plaintiff Scott Bloch's exercise of discretion and proper exercise of his duties. Barred him from continuing in his duties as Special Counsel in his investigations, his role on the Integrity Committee, and his oversight of the Office of Special Counsel, and retaliated against him and his wife and their family and molested them repeatedly in their property, contracts, employment, personal lives, and privacy because of Scott Bloch's execution of his duties and oath as a law enforcement office of the United States who was protecting the constitutional, whistleblower, and other rights of individuals throughout the United States, including David Iglesias, U.S. Attorney, Anne Whiteman, FAA whistleblower, Bobby Boutris and Douglas Peters, FAA whistleblowers, and numerous others. .

124. Defendants have continued in their molestation and hindrance of Plaintiffs.

125. As a direct and proximate result of Defendants' racketeering violations, Plaintiffs were damaged, including having to engage attorneys and incur expenses and economic loss in

excess of $2,000,000.00.

126. The actions of Defendants in violating this statute are improper, illegal, malicious, fraudulent, and willful, and justify an award of punitive damages.

127. Plaintiffs are entitled to damages, punitive damages, and attorneys fees and costs herein.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants: (1) declaring Defendants' conduct to be in violation of 42 U.S.C. 1985; (2) enjoining Defendants from continuing in such activity in the future; (3) awarding Plaintiff actual, compensatory damages, treble damages, economic loss, and reasonable attorney fees, and the costs of this action; and (4) granting any and all other relief that the Court deems just and proper.

**COUNT VII**

**(Bivens action for violations of Fifth Amendment Due Process, First Amendment Right of Free Speech, Petition of Congress, Freedom of Religion, Freedom of Association and Viewpoint, and Conspiracy to Commit violations of Fifth Amendment, First Amendment, Fourth Amendment violations, and attempts to Destroy Plainitff's Reputation – Bivens Plus, Vindictive Prosecution, Selective Prosecution, Misuse of Grand Jury, Intimidation and Misconduct)**

128. Plaintiff realleges paragraphs 1 through 127 as if fully stated herein.

129. Defendants acted in a manner intended to and having the effect of interfering with and hindering Plaintiff Catherine Bloch and Scott Bloch in exercising their constitutional rights under the Virginia and United States Constitutions of freedom of speech, association, and religious expression, and violated their rights to due process.

128. Defendants did either through force, intimidation, threat, or inducement through

other means, and through fraud, artifice and misuse of power, or through forgeries and perjuries, sought to raid Plaintiffs' home and invade their family life, seize their personal property, trash their religious articles, make innuendo and false and defamatory statements to the press, public and in the presence of Plaintiffs' children, held them up to ridicule before their neighbors, peers, and employees, and children,and otherwise interfered with contracts and committed illegalitites designed to harm Plainitffs in the exercise of their rights.

129. Defendants' conduct was not privileged or otherwise authorized, and they knew it to be in violation of well known rights and law.

130. Defendants intended to and did harm Plaintiffs' reputation and enjoyment of privacy.

131. Defendants' harmed Plaintiffs' property rights in Scott Bloch's position as Special Counsel, and his employability.

132. As a direct and proximate result of Defendants' racketeering violations, Plaintiffs were damaged, including having to engage attorneys and incur expenses and economic loss in excess of $2,000,000.00.

133. The actions of Defendants in violating this statute are improper, illegal, malicious, fraudulent, and willful, and justify an award of punitive damages.

134. Plaintiffs are entitled to damages, punitive damages, and attorneys fees and costs herein.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants: (1) declaring Defendants' conduct to be in violation of constitutional rights of Plaintiffs; (2) enjoining Defendants from continuing in such activity in the future; (3) awarding Plaintiff actual, compensatory damages, treble damages, economic loss, and reasonable attorney

fees, and the costs of this action; and (4) granting any and all other relief that the Court deems just and proper.

**COUNT VIII**
**(Civil Conspiracy to Interfere with Contract and Property Rights, Prospective Business Relations, and to Invade Plaintiff's Privacy)**

135. Plaintiff realleges paragraphs 1 through 134 as if fully stated herein.

136. Defendants committed a civil conspiracy in a manner intended to and having the effect of interfering with and hindering Plaintiffs'rightd to their reputation, business and employment rights, in violation of VA, Code §§ 18.2-499 through -501 whose acts are continuing in nature to this day.

137. Defendants intended to and did harm Plaintiffs' reputation and enjoyment of privacy.

138. Defendants' harmed Plaintiffs' property rights in Scott Bloch's position as Special Counsel, and his employability, as well as Catherine Bloch's rights to employment and enjoyment of her and her family's reputation untrammeled by Defendants' fraud and improper misconduct.

139. As a direct and proximate result of Defendants' violations, Plaintiffs were damaged, including having to engage attorneys and incur expenses and economic loss in excess of $2,000,000.00.

140. The actions of Defendants in violating this statute are improper, illegal, malicious, fraudulent, and willful, and justify an award of punitive damages.

141. Plaintiffs are entitled to damages, treble damages under the statute, punitive damages, and attorneys fees and costs herein.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against



[redacted]

Defendants: (1) declaring Defendants' conduct to be in violation of this Virginia statute; (2) enjoining Defendants from continuing in such activity in the future; (3) awarding Plaintiff actual, compensatory damages, treble damages, economic loss, and reasonable attorney fees, and the costs of this action; and (4) granting any and all other relief that the Court deems just and proper.

**COUNT IX**
**(Libel per se)**

142. Plaintiff realleges paragraphs 1 through 141 as if fully stated herein.

143. Defendants actions in leaking information to the press, making public statemtents, and otherwise harming publicly the family and personal names and reputations of Plaintiffs constitutes defamation, slander and libel per se.

144. In addition to the above, Defendants conspired with each other to publish false and defamatory remarks injurious to Plaintiff Scott Bloch as a lawyer, including but not limited to remarks in internet and press articles, releases, and other false and defamatory remarks referring in a contemptible, ridiculing, or professionally injurious way toward Plaintiff Scott Bloch, including the following: (1) repeated statements on NPR, Washington Post, Federal Times, Government Executive, The Hill, Politico, and other papers around Virginia and the country, tending to imply Plaintiff Scott Bloch is not a plaintiff's employment attorney; (2) statements referring to plaintiff possibly not informing the Bar of the District of Columbia about his Grand Jury investigation, which was known to be false; (3) implying knowledge of or influence over a continuing intent to issue a report from OPM IG "scathing" toward Scott Bloch; (4) scurrilous information in blogs and throughout the internet concerning the employment of Plaintiff, and attempting to harm him among peers in the legal profession, and otherwise

attempting to harm both plaintiffs in their right to privacy from these slanderous and defamatory attacks.

145. Defendants acted with knowledge of the falsity or with reckless disregard for the falsity of such publications and communications verbally and in writing.

146. As a direct and proximate result of Defendants' violations, Plaintiffs were damaged, including having to engage attorneys and incur expenses and economic loss in excess of $2,000,000.00.

147. The actions of Defendants in violating this statute are improper, illegal, malicious, fraudulent, and willful, and justify an award of punitive damages.

148. Plaintiffs are entitled to damages, punitive damages, and attorneys fees and costs herein.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants: (1) declaring Defendants' conduct to be in violation of the rights of Plaintiffs; (2) enjoining Defendants from continuing in such activity in the future; (3) awarding Plaintiff actual, compensatory damages, economic loss, and reasonable attorney fees, and the costs of this action; and (4) granting any and all other relief that the Court deems just and proper.

**COUNT X**
**(Whistleblower retaliation, retaliatory actions, discharge, threats, take over of agency without justification or lawful findings, Improper Bribes or Implied Bribes and Attempts to force out of Office, conspiracy to do so)**

149. Plaintiff realleges paragraphs 1 through 148 as if fully stated herein.

150. Defendants attacked Plaintiff Scott Bloch for blowing the whistle and bringing to light the violations brought to light by other whistleblowers, that revealed the corrupt behavior of

administration officials regarding misuse of appropriated funds as well as improper cover up of illegalities, and FAA violations of public safety as well as other whistleblower rights.

151. Defendants intended to and did harm Plaintiffs' reputation and enjoyment of Privacy because of Plantiff Scott Bloch's blowing of the whistle and protecting whistleblower disclosures and rights. Both he and his wife are entitled to the protections of whistleblowers and to be free from retaliation.

152. Defendants' harmed Plaintiffs' property rights in Scott Bloch's position as Special Counsel, and his employability, as well as Catherine Bloch's rights to employment and enjoyment of her and her family's reputation untrammeled by Defendants' fraud and improper misconduct.

153. As a direct and proximate result of Defendants' violations, Plaintiffs were damaged, including having to engage attorneys and incur expenses and economic loss in excess of $2,000,000.00.

154. The actions of Defendants in violating this statute are improper, illegal, malicious, fraudulent, and willful, and justify an award of punitive damages.

155. Plaintiffs are entitled to damages, punitive damages, and attorneys fees and costs herein.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants: (1) declaring Defendants' conduct to be in violation of the rights of Plaintiffs; (2) enjoining Defendants from continuing in such activity in the future; (3) awarding Plaintiff actual, compensatory damages, economic loss, and reasonable attorney fees, and the costs of this action; and (4) granting any and all other relief that the Court deems just and proper.

**COUNT XII**
**(Against OSC for payment of attorneys fees expended in all investigations, personal time spent on problems of reneging on attorneys fees, loss of reputation, loss of employment oopportunity, reliance damages, conversion of property, conspiracy to deprive Special Counsel the rights and emoluments of office, interference in Attorney Client Privilege)**

149. Plaintiff realleges paragraphs 1 through 148 as if fully stated herein.

150. Defendants OSC and individuals in OSC, as well as Defendants in conspiracy with them, attacked Plaintiff Scott Bloch for blowing the whistle and bringing to light the violations brought to light by other whistleblowers, that revealed the corrupt behavior of administration officials regarding misuse of appropriated funds as well as improper cover up of illegalities, and FAA violations of public safety as well as other whistleblower rights.

156. Defendants intended to and did harm Plaintiffs' reputation and enjoyment of Privacy because of Plantiff Scott Bloch's blowing of the whistle and protecting whistleblower disclosures and rights. Both he and his wife are entitled to the protections of whistleblowers and to be free from retaliation.

157. Defendants' harmed Plaintiffs' property rights in Scott Bloch's position as Special Counsel, and his employability, as well as Catherine Bloch's rights to employment and enjoyment of her and her family's reputation untrammeled by Defendants' fraud and improper misconduct.

158. Defendants further seized Plantiffs' property, attorney client privileged materials known to be between him and his private attorney, and refused to this day to turn them over, acted in furtherance of the conspiracy of other defendants to oust Plaintiff Scott Bloch from office and bar him from communicating with his employees or from carrying out the duties of his office, subjecting him to great ridicule and contempt publicly and made comments to the press

that violated their duties of loyalty, their oaths of office, and their fiduciary duties, which caused great damage to Plaintiff Scott Bloch.

159. As a direct and proximate result of Defendants' violations, Plaintiffs were damaged, including having to engage attorneys and incur expenses and economic loss in excess of $2,000,000.00.

160. The actions of Defendants in violating this statute are improper, illegal, malicious, fraudulent, and willful, and justify an award of punitive damages.

161. Plaintiffs are entitled to damages, punitive damages, and attorneys fees and costs herein.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants: (1) declaring Defendants' conduct to be in violation of the rights of Plaintiffs; (2) enjoining Defendants from continuing in such activity in the future; (3) awarding Plaintiff actual, compensatory damages, economic loss, and reasonable attorney fees, and the costs of this action; and (4) granting any and all other relief that the Court deems just and proper.

**COUNT XIII**

(Writ of Mandate)

162. Plaintiff realleges paragraphs 1 through 161 as if fully stated herein.

163. Defendants should be restrained from continuing in their improper actions as aforementioned and required to comply with the law to the extent any defendants still occupy an office of the United States.

164. Defendants should be restrained and required to compy with the law and cease violating Virginia and United States Statutes.

165. The Court should refer the matters proved herein for further investigation by the Attorney General of the State of Virginia to restrain these extreme violations of law against citizens of the Commonwealth of Virginia.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants: (1) declaring Defendants' conduct to be unlawful; (2) enjoining Defendants from continuing in such activity in the future; (3) and referring the matter for further investigation to the Attorney General of the State of Virginia; and (4) granting any and all other relief that the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment against Defendants:

(1) for damages as proved, in the amount of $100,000,000.00.

(2) for punitive damages in the amount of $100,000,000.00 to punish unlawful conduct and deter it in the future, and prevent further harm to the public interest;

(3) for economic and out of pocket loss of $2,000,000.00.

for costs of this action;

(4) for an injunction declaring Defendants' conduct to be unlawful;

(5) for an injunction enjoining Defendants from continuing in such activity in the future;

(6) and referring the matter for further investigation to the Attorney General of the State of Virginia; and

(7) granting any and all other relief that the Court deems just and proper.

Dated: April 25, 2011

Respectfully submitted,

CATHERINE A. BLOCH
Pro se
8408 Stockade Dr.
Alexandria, VA 22308
(703) 280-1258

Catherine A. Bloch

SCOTT J. BLOCH
Pro se
8408 Stockade Dr.
Alexandria, VA 22308
(703) 280-1258

Scott J. Bloch

**JURY TRIAL DEMANDED**

OF COUNSEL:
William J. Skepnek
SKEPNEK LAW OFFICES
PO Box 2226
Lawrence, Kansas 66044
Phone: (785) 856-3100
Fax: (785) 856-3099
bskepnek@sunflower.com

*Attorneys for Plaintiffs*



[redacted]